J-A14041-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| B.I.D., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| A.M., | |
| Appellee | No. 3591 EDA 2016 |

Appeal from the Order Entered October 17, 2016
In the Court of Common Pleas of Northampton County
Civil Division at No(s): C-48-CV-2015-5404

BEFORE:  BENDER, P.J.E., BOWES and SHOGAN, JJ.

MEMORANDUM BY SHOGAN, J.:                **FILED SEPTEMBER 01, 2017**

B.I.D. ("Mother") appeals *pro se* from the order entered October 17, 2016, denying her motion requesting permission to relocate from North Catasauqua, Northampton County, Pennsylvania, to Greensboro, North Carolina, with her minor daughter, S.A.M. ("Child") (born in December of 2012).  After careful review, we affirm.[1]

Mother and A.M. ("Father") are the biological parents of Child, and were never married.  Mother lives in Northampton County, Pennsylvania,

---

[1] A separate panel of this Court will address two appeals filed by Mother's prior counsel, Attorney Joseph P. Maher, from the trial court's orders holding him in contempt of court, and imposing two separate $500 fines for his contempt (Docket Nos. 1851 EDA 2016 and 3829 EDA 2016 (consolidated)). Also of note is the fact that Mother had other appeals previously pending. The records in Mother's and Attorney Maher's appeals are inextricably intertwined.

and Father lives in Springfield, Massachusetts. On November 19, 2015, the trial court entered the first formal custody order between the parties, awarding the parties shared legal custody, Mother primary physical custody, and Father partial physical custody. Numerous temporary orders have been entered since the first, each providing specific dates for Father's periods of partial custody.

On April 18, 2016, Mother served Father with her notice of relocation. On May 6, 2016, Father filed a counter-affidavit to Mother's notice of proposed relocation to North Carolina with Child, objecting to the proposed move.[2] On July 11, 2016, Father filed a counter-petition for modification of the existing custody order. On July 13, 2016, Mother filed her notice of proposed relocation.

The trial court held hearings on Mother's relocation petition on July 13, August 15, and August 19, 2016. On October 17, 2016, the trial court entered an order denying Mother's petition for relocation. The trial court issued findings of fact in its October 17, 2016 opinion, the most relevant of which we reproduce here:[3]

---

[2] Mother's notice of proposed relocation was not entered on the trial court's docket prior to the entry of Father's response.

[3] We refer the reader to the October 17, 2016 opinion for the trial court's full findings of fact.

# FINDINGS OF FACT

## A. Background

1. The parties are the biological parents of [Child].

2. Mother resides in North Catasauqua, Northampton County, Pennsylvania.

3. [Father] resides in Springfield, Hampden County, Massachusetts, approximately four hours from Mother's home by car.

4. The parties met while vacationing in January 2011 in Las Vegas, Nevada and soon began a long-distance relationship.

5. The parties saw each other regularly[,] with Father typically driving to Pennsylvania.

6. Mother became pregnant with [Child][,] upon telling Father, Father was initially unhappy.

7. Father came to accept Mother's pregnancy and continued his relationship with Mother, visiting regularly.

8. Father accompanied Mother to some of her doctor appointments during the pregnancy.

9. During Mother's pregnancy, Mother filed a PFA [petition for protection from abuse] against Father, but a permanent PFA [order] was not granted.

10. Father attended [Child's] birth and stayed in Pennsylvania for the first five days of [Child's] life.

11. Thereafter, [Child] remained with Mother, and Father visited approximately every two to four weeks, staying for three days at a time.

12. Both parties cared for [Child].

13. Although Mother testified that she had to teach Father how to change diapers and feed and bathe [Child], we find Father credible when he testified that he already knew how to perform these types of tasks. Father testified that he had experience caring for young relatives and took a ten-week parenting class in Massachusetts.

14. Father also helped care for [V.D.], Mother's now eleven-year-old daughter from a previous marriage.

15. On one or more occasions, Mother brought [Child] to Massachusetts so that Father's family could spend time with [Child].

16. In 2014, Mother sought to move to Massachusetts with [Child] and [V.D.] but ultimately did not relocate because a Lehigh County judge denied Mother's request to relocate as it relate[d] to [V.D.].

**B. Relations between the parties after ending their relationship**

17. The parties ended their romantic relationship during the winter of 2015.

18. Father continued to travel to Pennsylvania to see [Child], visiting multiple times per month.

19. When Father visited Pennsylvania, he often stayed at Mother's home.

20. Mother sought to obtain a PFA [order] against Father in June 2015, but this PFA [petition] was ultimately denied.

21. Following this incident, Father stayed at Mother's home twice, and on other occasions, Father was permitted to stay in a trailer located on Mother's property.

22. On one occasion, Mother asked Father if he could pick [Child] up later because Mother wanted to do an activity with [Child] and [V.D.] Father agreed, but Mother later refused to meet him nearby in Easton to lessen his travel time.

23. On November 19, 2015, the first formal custody order between the parties was entered by the Honorable Stephen G. Baratta.

24. Judge Baratta's Order provided specific dates for Father's periods of partial custody, which mirror Father's days off from work.

25. Numerous temporary orders have been entered since the first, each providing specific dates for Father's periods of partial custody.

26. Since the first custody Order, Father has had visitation approximately every other week for a period of three days at a time.

27. Father exercises or attempts to exercise every period of partial custody.

28. Beginning in December 2015, Father began to exercise overnight visits with [Child], which took place at a motel close to Mother's home.

29. In March 2016, Father traveled to Mother's home to take [Child] for his scheduled period of partial custody, and Mother would not allow [Child] to leave.  Mother told Father that she was taking [Child] to a babysitter's home, and consequently, Father returned to Massachusetts without having any custodial time with [Child].

30. Pursuant to a subsequent Order also entered by Judge Baratta and dated April 18, 2016, Father may exercise his visitation in Massachusetts.

31. On Father's Day 2016, Mother offered to drive [Child] to Father in Massachusetts.  Mother testified that when she was about one hour from Father's home, he told her that he had other plans and was not be [sic] available to see [Child].  Father testified that it was Mother who cancelled the visit and that he *was* available to see [Child].  We resolve credibility in favor of Father regarding this incident.

32. At the Non-Jury Trial, Mother admitted that on Father's Day 2016, she, instead, drove to Mohegan Sun, a casino resort

- 5 -

approximately one hour from Father's home. With her were [Child] and [V.D.]

33. On another occasion, Mother told Father that she was bringing [Child] to Father in Massachusetts but never arrived.

34. Mother routinely does not allow Father to pick [Child] up from daycare, and Mother listed [Child's] emergency contact as Joseph Maher, Esquire ("Attorney Maher"), Mother's former attorney and [V.D.'s] godfather as of approximately six months ago.

35. Mother sends Father texts containing derogatory language.

* * *

40. Mother has cursed at Father in front of [Child].

* * *

## C. Mother's Background

44. Mother was born in New Jersey but spent time in Puerto Rico as a child.

45. Mother's mother resides in New Jersey.

46. Most of Mother's family continues to reside in Puerto Rico.

47. Mother attended Cedar Crest College in Allentown, Pennsylvania[,] and has an associate's degree in engineering and a bachelor's degree in psychology.

48. After graduating from Cedar Crest College in 2004, Mother continued to reside in the Lehigh Valley.

49. Mother also enrolled at Lehigh Carbon Community College ("LCCC") in Schnecksville, Pennsylvania[,] in their accounting and paralegal school but withdrew the first day of classes and has not completed courses at LCCC.

50. In 2005, Mother married her now ex-husband.

51. Mother and her ex-husband had one child, [V.D.].

52. After the birth of her first child, Mother worked part-time and cared for [V.D.].

53. Mother and her ex-husband separated in 2009 and finalized their divorce in 2011.

54. Mother had primary custody of [V.D.], but Mother's ex-husband had significant periods of partial custody.

55. Mother receives approximately $1,100.00 in monthly child support from her ex-husband.

56. Mother lives in North Catasauqua in a home deeded to both herself and her ex-husband, but Mother has exclusive possession of the home, as per a property settlement agreement.

57. According to her 2015 tax returns, Mother earned $1,760.00, including unemployment, and worked for two months in a temporary position.

58. Mother currently works for a car dealership in an accounting position and earns approximately eleven or twelve dollars per hour.

59. Mother testified to the following monthly expenses:

    a. $1,400.00 in mortgage payment;
    b. $440.00 car payment;
    c. $118.00 motorcycle payment;
    d. $620.00 childcare;
    e. $500.00 food; and
    f. Additional expenses for utilities, gas, medications, etc.

* * *

## D. Father's Background

70. Father owns a home in Springfield, Massachusetts[,] and has owned and lived in said home since 2006.

71. Father has no other children.

72. Father has worked for the Connecticut Department of Corrections for twelve years and currently works at the Enfield Correctional Institute in Enfield, Connecticut.

73. Father earns approximately $69,000.00 per year.

74. Father's family, including his parents, siblings, and cousins, live in Springfield, Connecticut. [sic]

75. Father's parents have visited Pennsylvania to see [Child] and were in Pennsylvania in June 2016 to attend [Child's] dance recital.

### E. Psychological Evaluation and Violence Risk Assessment of Mother

76. On April 29, 2016, the Honorable Jennifer R. Sletvold entered an Order requiring Mother to submit to a psychological evaluation and risk assessment.

77. Frank M. Dattilio, Ph.D., ABPP ("Dr. Dattilio"), submitted his Psychological Evaluation and Violence Risk Assessment to this [c]ourt on September 12, 2016.

78. Dr. Dattilio concluded that Mother is prone to poor impulse control, hostility, and some aggression, rendering her a low to moderate risk for aggressive behavior, but Dr. Dattilio also concluded that Mother is not a serious danger to herself or others.

* * *

### F. Relocation

86. Mother seeks relocation to Greensboro, North Carolina[,] for family, financial, and medical reasons.

87. Mother does not have family in Pennsylvania but her cousin recently moved from Puerto Rico to North Carolina.

88. [Mother's] cousin's wife, [R.C.], and her cousins' [sic] child will also soon move from Puerto Rico to North Carolina.

89. Mother's cousins will live approximately ten or fifteen minutes away from Greensboro, but at the Non-Jury Trial, Mother could not recall their address.

90. Mother's ex-husband has an aunt and uncle who live two hours from Greensboro[,] but it is unclear if they have a relationship with Mother.

91. [("S.")], Mother's step-father who testified by phone, lives in Puerto Rico and testified that he would visit once or twice each year if Mother moved to North Carolina.

92. Mother has visited [S.] in Puerto Rico, and [S.] last visited Pennsylvania approximately three or more years ago.

93. [S.], who has health concerns, cannot frequently travel to Pennsylvania because of the colder weather but would be able to travel to North Carolina with more frequency.

94. [S.] is on social security and could stay for up to a month at a time during each visit.

95. As a caretaker for his disabled adult brother, [S.] must bring his brother along to any visits to North Carolina.

96. The length of [S.'s] visits would depend on the health of [S.] and his brother.

97. Mother has not secured a job in North Carolina but represents that she can find a job there using the same employment agency she uses in Pennsylvania.

98. Mother expects to make approximately fifteen or sixteen dollars per hour, slightly more than her Pennsylvania wage.

99. Mother plans to work part-time at first before transitioning into a fulltime position.

100. Mother also plans on continuing her education. Specifically, she intends on complet[ing] her paralegal and/or accounting degrees.

101. Mother visited North Carolina multiple times within the past year and visited in May 2016 with [V.D.].

- 9 -

102. While visiting North Carolina, Mother explored the area, local schools, and housing.

103. Mother found that the taxes and rent are cheaper in North Carolina than they are in Pennsylvania.

104. The weather in North Carolina is also conducive to Mother's ailments, such as back pain.

105. Mother's ex-husband owns a time share in Myrtle Beach, South Carolina[,] and [Mother] has been considering moving to North Carolina since her ex-husband purchased the time share in 2007.

106. Under a property settlement agreement with her ex-husband, Mother can use the time share property with her ex-husband's permission.

107. Mother proposes certain solutions to alleviate the burden Mother's relocation may pose to Father:

   a. Father could relocate to a closer correctional facility or find cheaper housing.

   b. The drive from North Carolina to Massachusetts is approximately eleven hours, and Mother could help provide transportation but will not drive halfway.

   c. Father could have substantial periods of custody during the summers.

108. Father opposes Mother's Notice of Proposed Relocation for the following primary reasons:

   a. Mother's proposed custody schedule does not coincide with his work schedule.

   b. Father and Father's parents cannot afford to travel regularly to North Carolina, and therefore, they could no longer attend events such as dance recitals if [Child] is in North Carolina.

   c. It would hinder his relationship with [Child].

Trial Court Opinion, 10/17/16, at 1-16.

On November 8, 2016, Mother filed a motion for reconsideration of the trial court's October 17, 2016 order. On November 10, 2016, the trial court denied Mother's motion for reconsideration. On November 16, 2016, Mother, acting *pro se*, filed a timely notice of appeal.[4] In an order entered November 16, 2016, the trial court directed Mother to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b) within twenty-one days. Mother filed her Pa.R.A.P. 1925(b) statement on December 2, 2016.[5] **See In re K.T.E.L.**, 983 A.2d

_____

[4] Nothing in our rules precludes Mother from filing both a motion for reconsideration and a notice of appeal. It often is prudent for a litigant to file both; if the trial court does not expressly grant the motion for reconsideration within the thirty day appeal period, the litigant will lose the right to appeal. Pa.R.A.P. 1701; **Orfield v. Weindel**, 52 A.3d 275, 277 (Pa. Super. 2012).

[5] We further note that on November 23, 2016, Mother filed a "motion to dismiss custody," seeking to dismiss Father's counter-petition for modification of the custody order filed on July 11, 2016. In an order entered December 13, 2016, the trial court denied Mother's motion to dismiss. Subsequently, Mother, acting *pro se*, filed an appeal, assigned Docket No. 543 EDA 2017, from the trial court's order denying her motion to dismiss Father's counter-petition for custody modification. On February 15, 2017, this Court *sua sponte* quashed the appeal at Docket No. 543, as taken from an interlocutory order because the trial court indicated in its opinion that it had scheduled a hearing on Father's petition for custody/modification to occur on March 13, 2017. Further, on February 17, 2017, we denied Mother's motion for reconsideration of our February 15, 2017 order, and denied her other related motions, noting Mother's dilatory conduct in attempting to delay the custody hearing scheduled for March 13, 2017, and prohibiting Mother from submitting any additional filings for relief without
*(Footnote Continued Next Page)*

745, 747-748 (Pa. Super. 2009) (finding that the appellant's failure to simultaneously file a Rule 1925(b) Statement in a children's fast track case did not result in waiver of all issues for appeal where the appellant later filed the Statement, and there was no allegation of prejudice from the late filing). The trial court filed an opinion pursuant to Pa.R.A.P. 1925(a) on December 7, 2016.[6]

On appeal, Mother presents the following issues:

1. Did Father commit perjury or make false statements during one or all of the day [sic] of the Relocation hearing? [Issue 4 in Concise Statement]

2. Whether there is substantial evidence that was not falsified by the Father that would warrant the [d]enying of Mother's relocation? [Issue 6 in Concise Statement]

3. Whether the fact that the Father choses [sic] to remain in Massachusetts and not relocate closer to the child in Pennsylvania, [sic] should count against him?

4. Whether substantial evidence supports that the [c]ourt should have held less weight to Fathers [sic] counter [sic] for Denying Mother's Relocation when he himself does not reside in Pennsylvania?

5. Whether Mother provided a reasonable alternative to visitation with the minor child, who will be of school age soon, to Father for the continuance of a relationship?

**Sub Issues**; [sic]

_____
(Footnote Continued)

prior permission from the trial court. It bears repeating that the custody matter is not presently before us.

[6] In an order entered December 22, 2016, Mother's petition for leave to proceed _in forma pauperis_ was granted as to filing fees only.

- 12 -

6. IF [sic] Father committed perjury[2] or false statements does should [sic] it be remanded for retrial?

> [2] On January 3, 2017 Mother filed a Motion for Contempt and Sanction against the Father,[sic] it was scheduled for a non-jury hearing for January 13, 2017, and however [sic] Hon. Judge Murray DENIED the Motion on January 4, 2017.

7. IF [sic] the Fathers [sic] lack of interest in relocating himself to co-parent more effectively then what weight or bearings upon the Court does it have when Mother must relocate due to the sale of her home[?]

8. IF [sic] Father is violating Mother's right to the pursuit of liberty and happiness for herself and the children, under the 14th Amendment[?]

9. If more weight should be given to the Mother who has always seen to the best interest of the child?

10. Are there available realistic alternative arrangements for substitute partial custody or visitation and will such arrangements adequately foster an ongoing relationship between the child and the noncustodial parent?

11. Did the trial [c]ourt err in not requiring Father to have a Forensic psychological evaluation based on his passed [sic] abuse of Mother?

12. Is the trail [sic] [c]ourt granting "preferential treatment"[3] to an [sic] Attorney Kollet that he formally rented space and treating Mother who is a *Pro Se* Litigant with unfavorably for challenging the Courts [sic] actions in all her Motions?

> [3] On January 3, 2017 Mother filed a Motion to Recuse Judge Samuel P. Murray and Attorney Catherine Lake Kollet after she had learned from a third party of a business relationship, sharing of an office[,] and on the record on January 4, 2017, Hon. Samuel Murray admitted that Kollet had been to his house at least on one occasion that he recalls.

Mother's Brief at 7-8 (footnotes in original).

We first note that although Mother presented twelve issues, inclusive of her "sub issues," in her brief, we find that only issues one and two are preserved because those are the only issues that Mother also set forth in her concise statement.[7] ***Hess v. Fox Rothschild, LLP***, 925 A.2d 798, 803 (Pa. Super. 2007) ("any issue not raised in an appellant's Rule 1925(b) statement will be deemed waived for purposes of appellate review.").

Moreover, although we recognize that Mother is proceeding *pro se*, this does not protect her from a finding of waiver. It is well established that

> [w]hile this [C]ourt is willing to liberally construe materials filed by a *pro se* litigant, . . . [such litigant] is not entitled to any particular advantage because he lacks legal training. Further, any layperson choosing to represent himself in a legal proceeding must, to some reasonable extent, assume the risk that his lack of expertise and legal training will prove his undoing.

***Rich v. Acrivos***, 815 A.2d 1106, 1108 (Pa. Super. 2003) (internal citations and quotation marks omitted).

In her first issue, Mother argues that Father "commit[ted] perjury or ma[d]e false statements during one or all of the day of the Relocation hearing." Mother's Brief at 7. Despite raising this issue in her statement of

---

[7] We further note that Mother's brief is not divided into sections in support of her various claims as required by Pa.R.A.P. 2119. We could also find waiver of her first two claims on this basis. For purposes of judicial economy, however, to the extent we are able to discern Mother's arguments we shall address them.

questions presented, Mother fails to develop this claim in her brief. "Arguments which are not appropriately developed are waived. Arguments not appropriately developed include those where the party has failed to cite any authority in support of a contention." *R.L.P. v. R.F.M.*, 110 A.3d 201, 208-209 (Pa. Super. 2015). Moreover, we note that as a reviewing Court, we defer to the credibility determinations made by the trial court judge. *C.R.F. v. S.E.F.*, 45 A.3d 441, 443 (Pa. Super. 2012). Thus, Mother's first issue merits no relief.

In her second issue, Mother appears to be arguing that the trial court erred in denying her motion to relocate. Mother's Brief at 7.[8] Specifically, Mother asserts that although the Child Custody Act, 23 Pa.C.S. §§ 5321-5340, has altered the custody and relocation analyses, the *Gruber*[9] case law analysis remains, as well as the best-interests analysis in a custody determination. *Id.* at 13-14. Accordingly, Mother maintains that the trial court erred in not considering all of the *Gruber* analysis and relocation factors. *Id.* at 14. Additionally, Mother argues that the trial court's order was not supported by substantial evidence concerning the "best interest" of

---

[8] We note that Mother's second issue as presented in her statement of questions, while inartfully pled, when read in conjunction with the remainder of her brief appears to present the argument that the trial court abused its discretion in denying her petition to relocate. To this extent, we shall address Mother's second issue.

[9] *Gruber v. Gruber*, 583 A.2d 434, 439 (Pa. Super. 1990).

Child.  *Id.* at 18.  Mother asserts that the factors weigh in her favor, and that the court must heavily weigh the bond between Mother and Child because Mother has been Child's primary caregiver, and Mother chose to keep Child despite Father's initial position that Child be aborted.  *Id.* at 18-20.

The relevant scope and standard of review are as follows:

> The appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it.... However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination.... Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and thus, represent a gross abuse of discretion.

*R.M.G., Jr. v. F.M.G.*, 986 A.2d 1234, 1237 (Pa.Super.2009) (quoting *Bovard v. Baker*, 775 A.2d 835, 838 (Pa.Super.2001)).  Moreover,

> On issues of credibility and weight of the evidence, we defer to the findings of the trial court who has had the opportunity to observe the proceedings and demeanor of the witnesses.

> The parties cannot dictate the amount of weight the trial court places on evidence.  Rather, the paramount concern of the trial court is the best interest of the child.  Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.

- 16 -

> ***R.M.G., Jr.***, ***supra*** at 1237 (internal citations omitted). The test is whether the evidence of record supports the trial court's conclusions. ***Ketterer v. Seifert***, 902 A.2d 533, 539 (Pa.Super.2006).

***A.V. v. S.T.***, 87 A.3d 818, 820 (Pa. Super. 2014).

Where a request for relocation of a parent and the subject child is involved, the trial court must consider the following ten relocation factors set forth within Section 5337(h) of the Act:

> **(h) Relocation factors.--**In determining whether to grant a proposed relocation, the court shall consider the following factors, giving weighted consideration to those factors which affect the safety of the child:
>
> (1) The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the nonrelocating party, siblings and other significant persons in the child's life.
>
> (2) The age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child.
>
> (3) The feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties.
>
> (4) The child's preference, taking into consideration the age and maturity of the child.
>
> (5) Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party.
>
> (6) Whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity.

(7) Whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity.

(8) The reasons and motivation of each party for seeking or opposing the relocation.

(9) The present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the child or an abused party.

(10) Any other factor affecting the best interest of the child.

23 Pa.C.S. § 5337(h). *See E.D. v. M.P.*, 33 A.3d 73, 81-82 (Pa. Super. 2011) ("Section 5337(h) mandates that the trial court **shall** consider all of the factors listed therein, giving weighted consideration to those factors affecting the safety of the child") (emphasis in original). *See also D.K. v. S.P.K.*, 102 A.3d 467, 477-478 (Pa. Super. 2014) (holding that trial court is to consider the Section 5337(h) factors where a parent is seeking permission to relocate with child). Additionally, Section 5337(i) provides that the "party proposing the relocation has the burden of establishing that the relocation will serve the best interest of the child as shown under the factors set forth in subsection (h)," and that each party "has the burden of establishing the integrity of that party's motives in either seeking relocation or seeking to prevent the relocation." 23 Pa.C.S. § 5337(i).

We first note that Mother's argument that the trial court erred in failing to use the *Gruber* analysis is without merit. This Court has held the following with regard to the previously used *Gruber* analysis:

Under prior practice, trial courts considered relocation requests based upon the three-factor test set forth in *Gruber v. Gruber*, 400 Pa.Super. 174, 583 A.2d 434, 439 (1990). Under the Child Custody Act, however, trial courts must consider the ten factors listed in subsection 5337(h). In particular, while the *Gruber* test required consideration generally of the "potential advantages of the proposed move and the likelihood that the move would substantially improve the quality of life for the custodial parent and the children," *Gruber*, 583 A.2d at 439, subsection 5337(h) sets forth a number of specific factors intended to isolate and focus this important inquiry.

*E.D.*, 33 A.3d at 79. Because Mother's petition for relocation was filed after January 24, 2011, the Child Custody Act applies.[10] Accordingly, the trial court properly applied the relocation factors under the Child Custody Act pursuant to 23 Pa.C.S. § 5337(h).

The trial court addressed the ten relocation factors, as follows.

**A. Relocation Factors**

**(1) The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the nonrelocating party, siblings and other significant persons in the child's life.**

Both parties have substantial roles in [Child's] life. Although [Child] has primarily lived with Mother since birth, Father consistently exercises his periods of partial custody and sees [Child] approximately every other week for about three days at a time. Father also has visited Pennsylvania to attend [Child's] events, such as dance recitals and birthday parties.

[Child] also has a half-sister, [V.D.], who currently resides with Mother's ex-husband in Pennsylvania. [Child] and [V.D.]

---

[10] *See E.D.*, 33 A.3d at 78-79 (explaining that the Child Custody Act applies to all matters relating to child custody, including relocation, after the Act's effective date of January 24, 2011.).

have a healthy sibling relationship, and for most of [Child's] life, [V.D.] also resided in Mother's home. It is unclear whether [V.D.] could relocate with Mother given that [V.D.'s] father also lives in Pennsylvania and currently holds primary custody of [V.D.]. Most of Mother's family reside in Puerto Rico, and although [Child] has visited Puerto Rico, she clearly sees those family members with less frequency.

Father's extended family, including his parents, aunts and uncles, and cousins, all live close to Father's home in Massachusetts. When Father exercises his partial custody with [Child] in Massachusetts, [Child] frequently sees Father's extended family. On multiple occasions, [Child's] paternal grandparents have traveled to Pennsylvania to see [Child].

Accordingly, we find that this factor favors both parties for their consistent support of [Child]; however, as this factor relates to extended family members, we find that it favors Father.

**(2) The age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child.**

[Child] is only three years old, and thus, she has not yet started kindergarten. Further, the parties report no special needs of [Child]. Given her young age, [Child] could likely relocate without great impact. However, because Mother's proposed relocation would mean [Child] would likely have less contact with Father, this effect will likely negatively impact [Child's] emotional development. For this reason, this factor slightly favors Father.

**(3) The feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties.**

If Mother's request to relocate were granted, [Child] would live approximately eleven hours from Father. While Father presently lives four hours from [Child], he is still able to see her with frequency and for a few days at a time. It is plainly not feasible that Father's relationship with [Child] and a suitable

custodial arrangement could be preserved if Mother were to relocate with [Child].

We base our conclusion on a number of Father's representations. The financial burden on Father would greatly increase, and he and his family could not make short trips to see [Child] for birthdays and dance recitals. Because the distance between the parties would more than double, much of Father's visitation would be spent driving even if Father exercised his visitation out of a hotel in North Carolina.

Further, Mother proposes many suggestions to help make relocation more feasible for Father, but this Court finds these proposals unrealistic. First, Mother suggests that Father find new employment at a closer correctional facility. The proposition that Father could move closer to Mother undermines Mother's credibility in making her request to relocate.

Second, Mother suggests that Father find cheaper housing to, presumably, have more resources to travel to North Carolina. Expecting that Father also move to make Mother's proposed relocation more convenient is impractical. This Court does not anticipate that Father would sell his home of more than ten years and move to a different state because of Mother's request to relocate.

Third, Mother plans to help in the transportation. However, Mother testified that she could drive three and a half to five hours, less than half of the eleven[-]hour drive to Massachusetts. Further, the parties are currently four hours away by car, but Mother has been inflexible and unreliable in assisting Father with transportation. Notably, during the course of the Non-Jury Trial, Mother agreed to help Father transport the [c]hild to Massachusetts for his next period of partial custody. On the record, the parties agreed on a location for the exchange with Mother's pick up and drop off point closer to home than Father's. On the date of the exchange, Mother sent her "driver," a twenty-year-old stranger[,] to Father and [Child], and claimed that she could not bring [Child] to the exchange point because of work. This [c]ourt has no confidence that Mother could consistently help transport [Child] when the parties live farther apart.

Fourth, although Mother proposed that Father have more extensive periods of custody during [Child's] summers, visitation during what will soon be [Child's] school year is unworkable given Father's work schedule. For example, Father's schedule typically allows three days off after working multiple longs shifts in a row. At the Non-Jury Trial, Mother proposed that[,] during those three days off, Father could travel to North Carolina and spend his visitation in North Carolina. Effectively, Father would spend one or more of those three days traveling and would have little time left to spend with [Child]. Thus, we find this factor weighs in favor of Father.

**(4) The child's preference, taking into consideration the age and maturity of the child.**

This factor is inapplicable for a variety of reasons, namely: [Child] is three years old; did not testify at trial; and no evidence was presented at trial that would suggest that [Child] has a mature preference.

**(5) Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party.**

On numerous occasions, Mother used inappropriate language to Father in the presence of [Child], contacted his work and family and criticized Father's ability to parent [Child], and interfered with Father's custodial time with [Child]. We do not find that Father engaged in this type of behavior. To the contrary, Father has allowed Mother more custodial time so that [Child] could do activities with [V.D.] and has displayed considerable patience. Therefore, we find this factor weighs in favor of Father.

**(6) Whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity.**

It is unclear whether Mother's general quality of life will be enhanced with her relocation to North Carolina. Although her goal is to work as a paralegal, this type of position likely requires an associate's degree or other schooling, and Mother has not yet started such a program. Mother reports that she plans to earn

approximately three to four more dollars per hour in North Carolina; however, Mother plans on working part-time before transitioning into full-time employment. Moreover, Mother owns a home in Pennsylvania, but upon moving to North Carolina, she plans to share a house or apartment with her cousins.

Further, Mother's main financial issue in Pennsylvania is affordable childcare. In North Carolina, Mother plans on using her cousins for childcare. However, only one of Mother's cousins lives in North Carolina, as of the Non-Jury Trial. Mother's cousin, [R.C.] and her child are not yet in North Carolina. Therefore, even if [R.C.] could provide childcare for [Child] in the future, she does not yet live in North Carolina. Similarly, Mother's step-father, [S.], might be able to provide intermittent childcare when he visits, but he resides in Puerto Rico. These visits depend on his and his brother's health, and [S.] will be accompanied by his brother, who also requires [S.'s] attention. However slight, these additional childcare resources will likely ease Mother's childcare costs.

Mother also contends that her proposed relocation is based upon medical reasons. Specifically, Mother maintains that North Carolina's warmer weather is more conducive for her ailments, including back pain. Mother's evidence relating to this factor was of such a low degree, [sic] that we find this factor favors Father.

**(7) Whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity.**

We also consider whether relocation will enhance [Child's] quality of life, and we find that it will not. Having Father eleven hours away from [Child] will not likely enhance her general quality of life. Here, both parties have been active in [Child's] life. Although Father might be able to continue regular visits with [Child] for a year or two, once [Child] begins kindergarten, Father's ability to see [Child] when he has off from work will significantly decrease. Thus, this factor also weighs in favor of Father.

**(8) The reasons and motivation of each party for seeking or opposing the relocation.**

- 23 -

Mother seeks relocation for three primary reasons: (1) familial, (2) financial, and (3) medical. Father opposes relocation because he contends Mother's proposed custody schedule is not feasible; relocation would hinder his and his family's relationship with [Child]; and he cannot afford to regularly travel to North Carolina.

We rely on our discussion of factors three and six above. Although both parties present legitimate arguments, we find Father's more powerful. That is, Mother's proposed relocation is heavily reliant on [R.C.] and her child moving to North Carolina to provide free childcare for [Child], but they do not yet live in North Carolina. To the contrary, Father opposes relocation because if [Child] lives in North Carolina, he will have substantially less periods of custody with [Child] and cannot afford regular travel to North Carolina. Therefore, we find that this favor weighs in favor of Father.

**(9) The present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the child or an abused party.**

Mother's ex-husband and [V.D.] have an active PFA against Mother, and Mother's parenting of [V.D.] was the subject of a CYF investigation. The CYF investigation concluded that Mother emotionally abused [V.D.]. Although there are no allegations regarding Mother's treatment of [Child], CYF assessed a moderate risk level for [Child] to continue to live in the home. This assessment was based upon Mother's use of inappropriate caregivers, namely [V.D.].

In assessing Mother's risk for aggressive behavior, Dr. Dattillo provided that Mother is a low to moderate risk and discussed [V.D.'s] allegations of both emotional and physical abuse against Mother. In light of the CYF investigation and Dr. Dattilio's findings, we find this factor favors Father.

**(10) Any other factor affecting the best interest of the child.**

We rely on our analysis provided in the preceding nine factors of our relocation analysis above.

**B. Balancing of the Relocation Factors**

- 24 -

Based on our analysis of the relocation factors, we find that the relocation factors support denying Mother's Notice of Proposed Relocation. Father's consistent and significant role in the Child's life strongly outweighs Mother's reasons for relocation. Although Mother points to ostensibly legitimate reasons for relocation, these reasons do not support granting Mother's request to relocate.

First, Mother hopes to utilize her familial resources in North Carolina to help reduce her monthly childcare costs, but Mother's main familial resources- [R.C.] and [S.] - do not reside in North Carolina. Second, although Mother reports that she will earn more per hour in North Carolina, Mother also plans to work part-time before transitioning into a full-time occupation. In effect, Mother will earn less income. Further, Mother's goal is to work at a paralegal but lacks the education for such a position. Third, Mother's vague representation that North Carolina weather will help her medical ailments is unsubstantiated and surely does not warrant such a drastic relocation. Fourth, the parties already live approximately four driving hours away from each other, and to grant Mother's request would be to more than double the distance between the parties. In light of these shortfalls in Mother's argument for relocation as well as our above analysis of each of the relocation factors, we deny Mother's Notice of Proposed Relocation.

Trial Court Opinion, 10/17/16, at 18-26.

After review of the record, we conclude that the trial court's determination regarding the relocation factors was supported by the evidence. The evidence reflects that Mother's proposed relocation would impose significant burdens on Father and would substantially interfere with his ability to continue his relationship with Child. Father currently travels approximately four hours to see Child approximately twice a month for three days at a time, for which his work schedule allows. N.T., 7/13/16, at 44, 126, 129. If Mother were permitted to move to North Carolina, Father would

have to travel up to eleven hours to see Child and, as a result, would not have as much time to spend with Child. *Id.* at 112, 120, 157-162. Moreover, despite testifying about her optimistic goals for improvements in her life, Mother failed to establish that the quality of life for her or Child would be improved in North Carolina. Mother did not have a job arranged in North Carolina, N.T., 7/13/16, at 57-60, 94, 113, she stated that she intended to earn a paralegal degree but was not enrolled in any program, *id.* at 61, 92, 109-110, 113, and her statements regarding support from family in North Carolina were vague and unsubstantiated. *Id.* at 63-67, 83-85, 117-118; N.T., 8/15/16, at 22-27. Thus, after careful review, we find no error or abuse of discretion on the part of the trial court in denying Mother's petition for relocation. The trial court's conclusions are not unreasonable as shown by the evidence of record. *A.V.*, 87 A.3d at 820.

As noted, Mother also argues that the trial court erred when it did not conduct a "best-interests analysis in a custody determination." Mother's Brief at 14. The trial court stated, "[b]ecause we deny Mother's Notice of Proposed Relocation, we do not need to assess the sixteen custody factors, as codified by the Child Custody Act, 23 Pa.C.S. § 5328." Trial Court Opinion, 10/17/16, at 17. We find no error on the trial court's part.

As this Court explained in *M.O. v. J.T.R.*, 85 A.3d 1058 (Pa. Super. 2014):

> The plain language of Section 5328(a) requires that the sixteen enumerated factors be considered when the court is

- 26 -

determining a child's best interest for the purpose of making an award of **custody**. By contrast, while the court must consider the child's best interest when modifying a custody order, the modification provision does not refer to the sixteen factors of Section 5328. **The cases in which we have applied Section 5328(a) have involved the award of custody as defined by Section 5323(a) or have involved a modification that also entailed a change to an award of custody**.

Following the hearing in this case, the trial court made no award of custody. The court was not deciding physical or legal custody, nor even changing the amount of custodial time that either party had with the Children. Rather, the trial court addressed a subsidiary issue: . . . While the court's ruling modified its prior order, it did not change the underlying award of custody. Therefore, under the facts of this case, Section 5328(a) was not implicated directly.

Because the trial court did not make an award of custody, but merely modified a discrete custody-related issue, it was not bound to address the sixteen statutory factors in determining the Children's best interest.

**M.O.**, 85 A.3d at 1062–1063 (citations and footnotes omitted) (emphasis added).

In a subsequent case, the Superior Court further explained:

A reading of the § 5328(a) factors further supports our interpretation that all these factors only must be considered **when a "form of custody" is ordered**. Most of the § 5328(a) factors are better suited to addressing the larger issue of the form of custody to be awarded, rather than considerations beneficial to resolving discrete and ancillary disputes relating to custody. In the latter, the considerations that could affect a trial court's decision are myriad. Thus, it makes little sense for a trial court to analyze each of the sixteen 5328(a) factors when arbitrating, for example, a dispute over a custody exchange location; which youth sports the children should play; or whether a parent should be required to have children's toys, beds, or other things in his or her house. **Rather, when read as a whole, it is apparent that the § 5328(a) factors were designed to guide the best-interest analysis when a trial**

**court is ordering which party has the right to a form of custody**.

*S.W.D. v. S.A.R.*, 96 A.3d 396, 403 (Pa. Super. 2014) (footnote omitted) (original emphasis omitted) (emphasis added).

Here, the order denying Mother's petition to relocate did not impact the custody arrangement between Mother and Father. Accordingly, the trial court was not required to perform an analysis of those factors. *M.O.*, 85 A.3d 1062-1063; *S.W.D.*, 96 A.3d 403.

Moreover, Father filed a separate petition for modification of custody on July 11, 2016. As indicated above, separate hearings were scheduled and conducted on that petition. Thus, the modification of custody proceedings were not before the trial court in this matter and therefore, the trial court was not required to consider the best interest custody factors under section 5328(a).

In sum, our review of the record in this matter supports the trial court's factual findings and conclusions of law. Accordingly, we affirm the order of the trial court.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/1/2017